## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, *et al.* | |
| Plaintiffs, | |
| v. | Civil Action No. 1:09-CV-955-TWT |
| WATSON PHARMACEUTICALS, INC., *et. al.,* | |
| Defendants. | |

## PLAINTIFF FEDERAL TRADE COMMISSION'S
## MOTION TO MODIFY PROTECTIVE ORDER

On December 7, 2012, the United States Supreme Court granted the Federal Trade Commission's petition for certiorari in this case.  See *FTC v. Watson Pharms., Inc.*, No. 12-416 (S. Ct. Dec. 7, 2012).  The Supreme Court will decide whether the Eleventh Circuit rule requiring dismissal of the complaint in this case is the appropriate test for assessing an antitrust challenge to what have become known as "reverse-payment" agreements between branded and generic drug companies.  The record before the Supreme Court will include an exhibit to the FTC complaint that is currently under seal pursuant to a protective order this Court issued on February 23, 2010 (Doc. No. 154), after granting defendants' motion to dismiss.  Because there have been significant changes in the circumstances under

which this protective order was issued that affect the balancing of the competing

interests in public access and confidentiality, the FTC respectfully requests that

this Court modify its protective order to permit public disclosure of the document.

Courts have inherent power to modify their protective orders to take account

of changed circumstances.  *See Marshall v. Planz*, 347 F. Supp. 2d 1198, 1201,

1204 (M.D. Ala. 2004); 8A Wright, Miller et al., Federal Practice & Procedure §

2044.1.  Although courts in some jurisdictions require "extraordinary

circumstances" or "compelling need" to modify a protective order, courts in this

circuit have applied a "balancing test" which considers the competing interests in

access and confidentiality, in light of the particular circumstances.  *SRS Techs.,*

*Inc. v. Physitron, Inc.*, 216 F.R.D. 525, 529-30 (N.D. Ala. 2003) (citing *Pansy v.*

*Borough of Stroudsburg*, 23 F.3d 772, 790 (3d Cir. 1994)); *accord Boca Raton*

*Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 271 F.R.D. 530, 537 (S.D. Fla. 2010)

(noting the lack of any "definitive test" in the Eleventh Circuit and following the

balancing test described in *SRS Technologies*, 216 F.R.D. at 530).[1]

As discussed below, there are two key reasons why the balance of these

competing interests has shifted in favor of disclosure since the protective order was

---

[1] One of the factors courts consider before modifying a protective order is the
parties' reliance on the protective order.  *See SRS Techs.*, 216 F.R.D. at 530 (citing
*Pansy*, 23 F.3d at 790).  But Solvay produced this document during the FTC's
investigation, before the protective order was issued.

issued.  First, the grant of certiorari creates a heightened public interest in disclosure of the exhibit to the FTC's complaint.  This increased weight to the right of public access raises the threshold for any countervailing confidentiality justification.  Second, Abbott Laboratories' 2010 acquisition of Defendant Solvay Pharmaceuticals, Inc., the release of actual AndroGel sales figures that differ significantly from Solvay's 2006 estimates, and changes in the AndroGel business over the past three years have rendered the confidentiality concerns about material in the document largely moot and comparatively insubstantial.

The FTC respectfully requests that this Court consider this motion expeditiously, given the briefing schedule before Supreme Court.  The FTC's opening brief and the joint appendix, which will include the exhibit to the FTC's complaint, are due on January 22, 2013.  Immediately after receiving notice that the Supreme Court had granted certiorari, the FTC contacted counsel for Solvay to inquire whether the company would consent to unsealing the exhibit.  Solvay has not yet provided a response.

## I.    The Supreme Court's Grant of Certiorari Creates a Heightened Public Interest in Disclosure of the Exhibit Attached to the FTC's Complaint.

Courts have long recognized a common-law presumptive right of public access to judicial records.  *Nixon v. Warner Commc'ns., Inc.*, 435 U.S. 589, 597-98 (1978).  Underlying this presumption is the recognition that such access fosters

3

public understanding and monitoring of the courts and government agencies.  *See,*

*e.g.*, *id.* (access to judicial records serves "the citizen's desire to keep a watchful

eye on the workings of public agencies"); *Chicago Tribune v. Bridgestone/*

*Firestone, Inc*., 263 F.3d 1304, 1311 (11th Cir. 2001) (public access to the judicial

process is "instrumental in securing the integrity of the process").  Although the

presumption of public access does not extend to unfiled discovery materials, the

Eleventh Circuit has held that materials considered in connection with "any

substantive pretrial motion" are subject to the right of access.  *Romero v.*

*Drummond Co., Inc.*, 480 F.3d 1234, 1245 (11th Cir. 2007); *accord Chicago*

*Tribune*, 263 F.3d at 1312.  This common law right to judicial records is not

absolute; the weight to be afforded the presumptive right of access depends on the

circumstances of a given case.  *Nixon*, 435 U.S, at 598-99.

The Supreme Court's decision to grant review substantially increases the

interest of the public in these judicial proceedings.  The grant of certiorari reflects

the national importance of the question presented:  "Whether reverse-payment

agreements are per se lawful unless the underlying patent litigation was a sham or

the patent was obtained by fraud (as the court below held), or instead are

presumptively anticompetitive and unlawful (as the Third Circuit has held)."

Petition for a Writ of Certiorari, at I, *FTC v. Watson Pharms., Inc.*, No. 12-416

(Oct. 4, 2012).  Indeed, Solvay supported the FTC's petition for certiorari, acknowledging that it presented "an issue of national importance."  Brief for Respondent Solvay Pharms., Inc., at 1, *FTC v. Watson Pharms., Inc.*, No. 12-416 (Nov. 13, 2012).  Attorneys general representing 31 states filed an amicus brief supporting the petition, and other organizations interested in this issue will likely submit amicus briefs now that the Supreme Court has granted certiorari.[2]  The Supreme Court's decision will establish a nationwide rule to govern antitrust law enforcement challenges to reverse-payment agreements by pharmaceutical companies, an issue with substantial economic consequences for the public.

   The public interest in access to the exhibit is thus significantly greater now than it was when this Court originally considered whether to seal the document.

--------

[2] *See* Brief for the States of New York, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Nevada, New Hampshire, New Mexico, Ohio, Oregon, Pennsylvania, Rhode Island, Tennessee, Utah, Vermont, Washington, West Virginia, and Wyoming as *Amici Curiae* in Support of Petitioner at 18, *FTC v. Watson Pharms., Inc.*, No. 12-416 (Nov. 5, 2012) ("The question presented by this case has enormous practical significance for consumers of pharmaceutical products, for the national economy, and for the States."). Petitions in other reverse-payment cases have elicited amicus submissions from scholars in law, economics, and other disciplines, advocacy organizations such as AARP, the American Antitrust Institute, and the Washington Legal Foundation, and various trade associations.  *See Upsher-Smith Labs., Inc. v. Louisiana Wholesale Drug Co., Inc.*, No. 12-265 (Aug. 29, 2012); *Merck & Co. v. Louisiana Wholesale Drug Co., Inc.*, No. 12-245 (Aug. 24, 2012);  *Louisiana Wholesale Drug Co., Inc. v. Bayer AG*, No. 10-762 (Dec. 6, 2010).

Though sealed, it continues to be part of the FTC's complaint, and it is properly considered in evaluating a motion to dismiss under Rule 12(b)(6). *See, e.g., Thaeter v. Palm Beach County Sheriff's Office*, 449 F.3d 1342, 1352 & n.7 (11th Cir. 2006) (stating that, on a motion to dismiss, the court may consider the narrative allegations in the complaint and any attached exhibits). Given the procedural posture, the exhibit is a central part of the limited record that will now be before the Supreme Court as it resolves the important legal and policy issues presented by the case.

The exhibit, Solvay's "Project Tulip Financial Analysis," shows the internal calculations prepared by the company and used for negotiations to settle the patent infringement cases against Watson Pharmaceuticals, Inc. and Paddock Laboratories, Inc. The exhibit illustrates in concrete form exactly what economic theory predicts about the incentives of branded and generic drug firms to agree to exchange payments for delayed generic entry. In this analysis, Solvay compared the expected returns from continuing to litigate with the expected returns through the proposed settlement, for both Solvay and the generic challengers. It shows with forecasted dollar amounts how Solvay and its generic rivals would all be better off by forestalling generic entry and sharing Solvay's continued monopoly profits on AndroGel that would be preserved by an agreement not to compete. The

analysis details how each additional year of avoided competition increases the amount of monopoly profits available for the three companies to split.  The exhibit thus illustrates the core antitrust concern that distinguishes reverse-payment settlements from the vast majority of patent litigation settlements.

Now that this case is before the Supreme Court, the public has an even greater interest in understanding the basis for the FTC's position that reverse-payment agreements settling patent litigation between branded and generic drug firms amount to "pay for delay" deals that cost consumers and our health care system dearly.  The public interest in accessing judicial records is particularly strong when they shed light on the operation of the courts and the decision-making of a federal agency.  *Romero*, 480 F.3d at 1246; *see also FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) ("[W]here the government is a party . . . , the public's right to know what the executive is about coalesces with the concomitant right of the citizenry to appraise the judicial branch."); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1180-81 (6th Cir. 1983) (finding that the "public has an interest in knowing how the [FTC] has responded to allegations of error" in the tar and nicotine testing program and "in ascertaining what evidence and records the [courts] have relied upon in reaching [their]

decisions").  This heightened interest in public access calls for careful scrutiny of the justifications for continuing to keep the document under seal.

## II.    Solvay's Competitive Concerns No Longer Warrant Sealing the Exhibit.

The factual circumstances that supported Solvay's confidentiality concerns have also fundamentally changed.[3]  In the three years since the protective order was issued, Solvay has been acquired by Abbott Laboratories, Abbott has released actual AndroGel sales figures that undercut the competitive significance of Solvay's 2006 projections, and a new version of the drug (known as "Androgel 1.62%") now accounts for over half of total AndroGel sales.  These changes provide further reason for the Court to reevaluate its balancing of the public and private interests and exercise its discretion to modify or vacate the protective order. *See Marshall*, 347 F. Supp. 2d at 1204 ("[T]he sealing order should remain subject to modification and even vacation by the court if the underlying reason for the order no longer obtains.").

---

[3] The FTC's brief in opposition to Solvay's original motion for a protective order explains why many of Solvay's concerns were overstated or unsubstantiated, even at that time. *See* FTC Opp. 6-12, Doc. No. 123 (June 17, 2009). The FTC's current motion focuses on the changed circumstances that warrant reconsidering the decision to seal the document, but the earlier briefing may also provide a useful explanation of Solvay's confidentiality concerns.

*Acquisition by Abbott.*

Most significantly, the AndroGel franchise is now under a different corporate management structure.  In February 2010, Abbott Laboratories purchased Solvay Pharmaceuticals and absorbed AndroGel and Solvay's other products into its broader pharmaceuticals operations.  *See* Abbott 2010 Annual Report (Mar. 3, 2011), http://media.corporate-ir.net/media_files/irol/94/94004/Proxy_Page/AR_2010.pdf.  Abbott's acquisition of Solvay and integration of the AndroGel product line removes many of the confidentiality concerns cited in Solvay's motion for a protective order.  Solvay emphasized the importance of its "proprietary 'Business Logic'" it used to evaluate the co-promotion agreements, Solvay Mot. for Protective Order at 5, Doc. No. 117 (June 5, 2009); *see also id.* at 13 (discussing the "economics and decision-making models utilized by Solvay's management to evaluate future commercial transactions"), but there is no indication that Abbott has adopted this same Solvay approach rather than following Abbott's own established analytical models.

Abbott is a large, diversified health care company with an extensive portfolio of pharmaceutical products and significant experience with various forms of business partnerships.  The concern that the exhibit might provide insight into Solvay's strategy for AndroGel, *id.* at 12-14, is misplaced given that Abbott's

9

management team and corporate board is now in control of the product line.

Whatever information the document may have provided about how Solvay

management would evaluate future partnership arrangements or how Solvay

management would approach future patent settlements, *id.* at 13, it provides no

meaningful insight into how Abbott management may approach these business

decisions.  The change in corporate control also minimizes any relevance to the

terms of the co-promotion agreements.  *See id.*, Exh. A (Kay Decl. ¶¶ 8-10).

Solvay had voiced concern that future transaction partners may be able to exploit

information about these deals in negotiations over similar transactions, but the

exhibit does not reveal the terms Abbott management may be willing to accept.

*Release of Actual AndroGel Sales Figures.*

Companies often guard the confidentiality of their sales projections and

other forecasts, but the basis for this concern dissipates as actual numbers replace

mere estimates.  Unlike Solvay,[4] Abbott discloses AndroGel sales on a quarterly

and annual basis.  *See, e.g.*, Abbott 2011 Annual Report, at 52 (Mar. 2, 2012),

http://media.corporate-ir.net/media_files/irol/94/94004/ Proxy_Page/AR2011.pdf.

These publicly available figures illustrate why six-year-old projections lose their

---

[4] Solvay's CFO had previously explained that as a Belgian company, Solvay was
not obligated to make publicly available projections of product sales.  *See id.*, Exh.
A (Kay Decl. ¶ 15).  This distinction no longer applies.

commercial significance once the actual data are released.  Indeed, Solvay's

projections from 2006 turned out to be vastly different than the actual 2010 U.S.

sales for the product.  *Compare id.* at 52 *with* Exh. A to 2d Am. Compl., at 13,

Doc. No. 114 (May 28, 2009).  Even though the exhibit includes some projections

that date forward to 2014 and 2016, *see* Solvay Mot. at 4; Solvay Reply at 5, Doc.

No. 125 (June 26, 2009), Abbott has presumably updated and revised these

projections to reflect the actual trajectory of AndroGel sales.  Other data included

in the exhibit, such as the information on the AndroGel patient population by type

of prescribing physician, *see* Solvay Mot. at 12; Solvay Reply at 6, and the data

supplied by IMS Health, *see id.* at 14, are also six years out of date, and generally

presented in an aggregated form that limits any potential confidentiality concern.

Although the forecasts and other financial data may have been competitively

sensitive when they were initially made, they are now so outdated that their

disclosure could not realistically harm Abbott's commercial interests.

*Changes in the AndroGel business*.

Further demonstrating how much the AndroGel business has changed since

this document was created in 2006, Abbott has now launched a new version of the

product, AndroGel 1.62%.  Supported by an aggressive and highly-visible

marketing campaign, AndroGel 1.62% accounts for more than half of AndroGel

sales.  *See* Abbott Laboratories Management Discusses Q2 2012 Results –

Earnings Call Transcript (July 18, 2012), http://seekingalpha.com/article/730061-

abbott-laboratories-management-discusses-q2-2012-results-earnings-call-

transcript.  This market development provides yet another reason why information

about Solvay's strategy for the older AndroGel product does not communicate

anything about Abbott's current strategy for the expanded AndroGel franchise.

 The AndroGel business has evolved in other important ways since the

protective order was issued.  For example, Abbott's six-year co-promotion

agreement with Par has now terminated.  2d Am. Compl. ¶ 77.  In addition, Abbott

has also settled patent litigation with two other generic firms seeking to market

generic versions of AndroGel 1.0%, further reducing the likelihood that

competitors may glean any useful information from the document.  *See* Abbott

Laboratories' CEO Discusses Q4 2011 Results – Earnings Call Transcript (Jan. 25,

2012), http://seekingalpha.com/article/322061-abbott-laboratories-ceo-discusses-

q4-2011-results-earnings-call-transcript.  More broadly, Abbott has announced that

it will be dividing into two separate companies, spinning off its research-based

pharmaceutical business into a new company, as of January 1, 2013.  Abbott 2011

Annual Report, *infra*, at 2-4.  Abbott's continuing corporate evolution illustrates

the dynamic nature of the pharmaceutical industry, and further underscores how

inconsequential the competitive information disclosed in this six-year-old document has become.

## III.   Conclusion.

However sensitive the exhibit may have been when it was created, those concerns have now largely dissipated.  Even if the exhibit still contains some degree of confidential information, the heightened public interest now that the Supreme Court has granted certiorari justifies modifying the protective order.  In light of these changed circumstances, the FTC requests that the Court unseal the exhibit.  In the alternative, the FTC requests modification of the order to allow disclosure of the most relevant portions of the exhibit with redactions to shield any confidential material that still merits protection.  *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F. Supp. 866, 982 (E.D. Pa. 1981) ("[A] protective order should always be narrowly drawn.").  With the opening brief and joint appendix due to the Supreme Court on January 22, 2012, the FTC requests expedited consideration of this motion.

Respectfully submitted this 10th day of December, 2012.

/s/ Markus H. Meier
MARKUS H. MEIER*
BRADLEY S. ALBERT*
ELIZABETH R. HILDER
MICHAEL J. PERRY
Federal Trade Commission
601 New Jersey Avenue, N.W.
Washington, DC 20580
Tel: (202) 326-3759
Fax: (202) 326-3384
mmeier@ftc.gov
*Admitted *pro hac vice*

/s/ Cindy A. Liebes
CINDY A. LIEBES
Georgia Bar No. 451976
Federal Trade Commission
225 Peachtree Street, N.E.
Suite 1500
Atlanta, GA 30303
Tel: (404) 656-1359
cliebes@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*

## LOCAL RULE 7.1(D) CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing has been prepared with one of the font and point selections approved by the court in Local Rule 5.1(C), specifically Times New Roman 14 point font.


Dated:      December 10, 2012          */s/ Cindy A. Liebes*
                                       CINDY A. LIEBES
                                       Georgia Bar No. 451976
                                       Federal Trade Commission
                                       225 Peachtree Street, N.E.
                                       Suite 1500
                                       Atlanta, GA 30303
                                       Tel: (404) 656-1359
                                       cliebes@ftc.gov

                                       *Counsel for Plaintiff*
                                       *Federal Trade Commission*

## CERTIFICATE OF SERVICE

I certify that on December 10, 2012, I electronically filed Federal Trade Commission's Motion to Modify Protective Order and [Proposed] Order with the Clerk of the Court using the ECF system, which sent notification to all counsel of record registered with the Court.


Dated:        December 10, 2012            */s/ Cindy A. Liebes*
                                           CINDY A. LIEBES
                                           Georgia Bar No. 451976
                                           Federal Trade Commission
                                           225 Peachtree Street, N.E.
                                           Suite 1500
                                           Atlanta, GA 30303
                                           Tel: (404) 656-1359
                                           cliebes@ftc.gov

                                           *Counsel for Plaintiff*
                                           *Federal Trade Commission*