IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: ANDROGEL ANTITRUST LITIGATION (NO. II) | MDL DOCKET NO. 2084 ALL CASES |
| | 1:09-MD-2084-TWT |
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | CIVIL ACTION FILE NO. 1:09-CV-955-TWT |
| ACTAVIS, INC., et al., | |
| Defendants. | |

**OPINION AND ORDER**

In FTC v. Actavis, Inc., 133 S. Ct. 2223 (2013), the Supreme Court reversed and remanded this case and instructed the Court to subject the Defendants' reverse payment settlements to a rule of reason antitrust analysis. Notwithstanding, Par, Paddock and Solvay claim in a renewed motion to dismiss that their reverse payment settlement is protected by the Noerr-Pennington doctrine because the underlying litigation was terminated by a consent judgment.

## I.  Background

This case concerns AndroGel, a testosterone replacement gel that has been a huge commercial success. Besins Healthcare, S.A. ("Besins") developed the pharmaceutical formula. It granted Solvay[2] a license to sell AndroGel in the United States, and agreed to supply AndroGel to Solvay when the drug was approved for sale. Solvay began clinical trials of AndroGel in 1996.

In April 1999, Solvay filed a New Drug Application ("NDA") with the Food and Drug Administration, seeking approval to commercially market AndroGel [see Doc. 587-68]. See 21 U.S.C. § 355(a). The FDA approved the NDA in February 2000, and Solvay began marketing AndroGel that June.  On August 30, 2000, Solvay and Besins filed a patent application with the U.S. Patent and Trademark Office ("PTO") [see Doc. 587-68]. On January 7, 2003, the patent application issued as U.S. Patent No. 6,503,894 (the "'894 Patent") [Doc. 587-66].

Before the '894 Patent issued, Watson Pharmaceuticals, Inc. (now Actavis, Inc.) and Paddock Laboratories, Inc. (collectively, the "Generics") began developing generic versions of AndroGel.  The Generics attempted to copy AndroGel "as close

---

[2] For purposes of this Order, "Solvay" refers collectively to Defendants Solvay Pharmaceuticals, LLC, Unimed Pharmaceuticals, LLC  and Abbott Products, Inc.

as humanly possible"[3] [Doc. 555, Ex. 1, at 14].   The Generics completed development even after learning of the '894 Patent.  Watson filed a Paragraph-IV Abbreviated New Drug Application ("ANDA")[4] for generic AndroGel in May 2003 [Doc. 587-13].  See 21 U.S.C. § 355(j)(2)(A)(vii).  Shortly thereafter, Paddock filed its own Paragraph IV ANDA for its own generic AndroGel [Doc. 587-22].  In July 2003, Paddock entered into an agreement with Par Pharmaceutical Companies, Inc. (collectively "ParPaddock") whereby Par agreed to share potential patent litigation costs with Paddock and to sell Paddock's generic AndroGel. In return, Paddock agreed to share profits with Par.  See In re Androgel Antitrust Litigation (No. II), 687 F. Supp. 2d 1371, 1374 (N.D. Ga. 2010).  As required by 21 U.S.C. § 355(j)(2)(A)(vii), both Watson and ParPaddock notified Solvay of the ANDAs and asserted that the '894 Patent was invalid or would not be infringed by their generic drugs.

---

[3]Solvay's patent application was not a matter of public record [see Doc. 555, Ex. 1, at 14].  Congress subsequently amended the patent laws to make pending patent applications public.  See 35 U.S.C. § 122(b)(1)(A).

[4]The ANDA must certify that (1) the patent has not been listed in the Orange Book, or (2) the patent has expired, or (3) the patent will expire on a certain date, or (4) the patent is invalid or will not be infringed by the generic drug. See 21 U.S.C. § 355(j)(2)(A)(vii).  When the ANDA certifies that the patent is invalid or will not be infringed, it is known as a Paragraph IV certification. For any ANDA with a Paragraph IV certification, the applicant must also notify the patent holder of the ANDA. 21 U.S.C. § 355(j)(2)(B).

Solvay responded to the ANDA notices by asserting its rights under the '894 Patent, again pursuant to the procedure laid out in 21 U.S.C. § 355(j)(2)(A)(vii). In August 2003, Solvay's subsidiary, Unimed, filed patent infringement actions against Watson and ParPaddock in this Court which automatically prevented the Generics from entering the market for 30 months. See Complaint, Unimed Pharm., Inc. v. Watson Pharm., Inc., No. 03 Civ. 2501 (N.D. Ga. Aug. 21, 2003) (2003 WL 23824320); Complaint, Unimed Pharm., Inc. v. Paddock Labs., Inc., No. 03 Civ. 2503 (N.D. Ga. Aug. 21, 2003) (2003 WL 23824347).

From late-2003 to mid-2005, the litigation proceeded with discovery and other preliminary matters. By August 2005, the parties had filed claim construction motions, agreeing that 25 claim terms required construction. No party filed a Daubert motion. By December 2005, Watson and ParPaddock had filed motions for summary judgment on the validity of the '894 Patent. Solvay opposed summary judgment, and the parties vigorously argued their positions.

Before the Court could resolve the motions, Solvay, Watson, and ParPaddock settled the cases [see Docs. 604-87, 604-88, 604-89, 604-91, 604-90, 604-92, 604-93, and 604-94, collectively, the "Settlement and License Agreements"]. Under the Settlement and License Agreements between Solvay and ParPaddock, Solvay agreed to a consent judgment dismissing the infringement action. In general, ParPaddock

agreed not to market generic AndroGel until the earliest of August 31, 2015, or the date another company launched generic AndroGel. Solvay also agreed to share profits of AndroGel with Par, and Par agreed to promote AndroGel to primary care physicians. Solvay estimated that its annual payments to Par would be about $6 million.   (See [Doc. 604-94], Art. III). Under the agreement between Solvay and Paddock, Solvay committed to share profits of AndroGel with Paddock, and Paddock agreed to serve as a backup supplier of AndroGel. Solvay estimated that its annual payments to Paddock would be about $2 million. The profit sharing and business promotion agreements between ParPaddock and Solvay were not disclosed to the Court and were not embodied in the consent judgment they submitted to the Court.[5] In essence, the Court rubber-stamped the proposed consent judgment.

The Settlement and License Agreements prompted an investigation by the Federal Trade Commission ("FTC").  In 2009, the FTC and a number of private parties filed these antitrust actions against Solvay, Watson, Par, and Paddock. All the actions were filed in other federal district courts and then transferred to this Court

---

[5] Under the Settlement and License Agreement with Watson, Solvay agreed to voluntarily dismiss the litigation, and Watson agreed not to market generic AndroGel until the earlier of August 31, 2015, or the date another company marketed generic AndroGel. Solvay agreed to share profits of AndroGel with Watson, and Watson agreed to promote AndroGel to urologists. Solvay estimated that its annual payments to Watson would be between $15 and $30 million. The settlement arrangement between Solvay and Watson is not at issue in this Order.

either by change of venue or by order of the United States Judicial Panel on Multidistrict Litigation. In 2009, ParPaddock and Solvay filed motions to dismiss [Docs. 8, 9, 22, 23, 24, 25, 26, 27, 28, and 29]. On February 22, 2010, the Court granted in part and denied in part the Defendants' motions [Doc. 50]. See In re Androgel Antitrust Litigation (No. II), 687 F. Supp. 2d 1371 (N.D. Ga. 2010). The Court concluded that, under Eleventh Circuit precedent, the Settlement and License Agreements were immune from antitrust scrutiny unless the underlying litigation itself was a sham. See id. at 1379-80.

The Eleventh Circuit affirmed that decision. But the Supreme Court reversed and remanded in FTC v. Actavis, Inc., 133 S. Ct. 2223 (2013). The Court held that the "near-automatic antitrust immunity" for reverse payment settlements in the Eleventh Circuit should be replaced with a "rule of reason" antitrust analysis. Id. at 2237. "That is because the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." Id.

Now, back before this Court, ParPaddock and Solvay argue that their settlement arrangement is protected by the First Amendment because it was embodied in a consent judgment signed by the Court. ParPaddock contends that the FTC's complaint

should be dismissed as a matter of law because its conduct was legitimate petitioning for government action and thus protected by the <u>Noerr</u>-<u>Pennington</u> doctrine.[6]

## II.  Motion to Dismiss Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief.  <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6).  A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely."  <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 556 (2007).  In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff.  <u>See</u> <u>Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.</u>, 711 F.2d 989, 994-95 (11th Cir. 1983); <u>see also</u> <u>Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.</u>, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination").  Generally, notice pleading is all that is required for a valid complaint.  <u>See</u> <u>Lombard's, Inc. v. Prince Mfg., Inc.</u>, 753 F.2d 974, 975 (11th Cir. 1985), <u>cert. denied</u>, 474 U.S. 1082 (1986). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim

---

[6] Solvay joins in Par's motion to dismiss. Watson has not moved to dismiss the second amended complaint.

and the grounds upon which it rests.  See Erickson v. Pardus, 551 U.S. 89, 93 (2007)

(citing Twombly, 127 S.Ct. at 1964).

### III.  Discussion

### A.    The Noerr-Pennington Doctrine

"Concerted efforts to restrain or monopolize trade by petitioning government

officials are protected from antitrust liability" under the Noerr-Pennington doctrine.

See Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499 (1988)

(citing Eastern Railroad Presidents Conference v. Noerr Motor Freight, 365 U.S. 127,

132 (1961)).

> The scope of [Noerr-Pennington immunity] depends … on the source,
> context, and nature of the anticompetitive restraint at issue. 'Where a
> restraint upon trade or monopolization is the result of valid governmental
> action, as opposed to private action,' those urging the governmental
> action enjoy absolute immunity from antitrust liability for the
> anticompetitive restraint … in addition, where, independent of any
> government action, the anticompetitive restraint results directly from
> private action, the restraint cannot form the basis for antitrust liability if
> it is 'incidental' to a valid effort to influence government action.

Id. at 499 (quoting Noerr, 365 U.S. at 136). However, in Allied Tube, the Court

rejected the "absolutist position that the Noerr doctrine immunizes every concerted

effort that is genuinely intended to influence governmental action." Id. at 503. "If all

such conduct were immunized then, for example, competitors would be free to enter

into horizontal price agreements as long as they wished to propose that price as an

appropriate level for governmental ratemaking." Id. Ultimately, the Court did not apply Noerr-Pennington immunity in Allied Tube because "the context and nature of petitioner's activity [in stacking the votes in a private standard-setting organization] make it the type of commercial activity that has traditionally had its validity determined by the antitrust laws themselves." Id. at 505.

Noerr-Pennington immunity also attaches to efforts seeking governmental action from the courts. See California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972); Professional Real Estate Investors v. Columbia Pictures Industries, 508 U.S. 49 (1993) (petitioning activity before a court is protected from antitrust scrutiny unless the conduct was objectively baseless and motivated by an improper subjective motivation to harm competitors simply through litigation); Andrx Pharm., Inc. v. Elan Corp., PLC, 421 F.3d 1227, 1234 (11th Cir. 2005) (noting that "the Sherman Act cannot be read to impede a litigant from seeking to defend constitutionally-permitted patent rights… engaging in litigation to seek an anticompetitive outcome from a court is a First Amendment activity that is immune from antitrust liability," but nevertheless subjecting the settlement agreement ending the litigation to antitrust scrutiny).

There are three cases that consider Noerr-Pennington immunity regarding consent judgments settling patent suits involving generic and brand-name drug

makers. Two of the cases concluded that Noerr-Pennington immunity should not protect the consent judgment settling the suits. In In re Nexium (Esomeprazole) Antitrust Litigation, No. 12-md-02409-WGY, 2013 WL 4832176 (D. Mass Sep. 11, 2013) ("Nexium"), AstraZeneca entered into settlement agreements with three generic drug makers. AstraZeneca paid one generic drug manufacturer to stop its patent suit against AstraZeneca; accepted a significantly reduced judgment from a prior successful infringement litigation against a second generic company; and agreed with a third generic company that its generic drug did not infringe AstraZeneca's patent, allegedly hindering the efforts of other generics to enter the market. Importantly, each of these agreements was embodied in a consent judgment. AstraZeneca argued that the consent judgments were entitled to Noerr-Pennington immunity, but the district court disagreed. The court initially noted that "[c]ourts are largely uniform in their view that private settlement agreements entered into during the pendency of litigation that are neither presented to nor approved by the judge presiding over the dispute fall outside the ambit of Noerr-Pennington immunity." Id. at *18 (citing Andrx Pharms., 256 F.3d at 818-19). Further:

> Nothing prohibited AstraZeneca and the Generic Defendants from simply stipulating to a dismissal of the patent infringement actions. A decision of the court that serves merely to memorialize a bargained-for agreement that could have been resolved without judicial intervention ought not benefit from the exemption allowed by Noerr-Pennington … Adopting the alternative view would provide litigants with an avenue

wholly impervious to antitrust scrutiny simply by seeking out a court's rubber-stamped approval.

Id. at *19 (citing MedImmune, Inc. v. Genentech, Inc., No. CV 03-2567 MRP, 2003 WL 25550611, at *7 (C.D. Cal. Dec. 23, 2003)). The court further stated that it was "not apparent that the New Jersey District Court actually played an independent role in drafting the terms in the consent judgments" and that, in the First Circuit, "the entering of a consent decree does not, by itself, reflect a court's assent to the substantive terms found therein." Id. at *20 (citing Liu v. Amerco, 677 F.3d 489, 497 (1st Cir. 2012)). The consent judgment was not protected by Noerr-Pennington.

Likewise, in In re Ciprofloxacin Hydrochloride Antitrust Litigation, 261 F. Supp. 2d 188 (E.D.N.Y. 2003) ("Cipro"), the court summarily dismissed the defendants' argument that a consent judgment produced Noerr-Pennington antitrust immunity. There, the branded manufacturer, Bayer, entered into three settlement agreements with generic manufacturers that stipulated to the validity of Bayer's patent, provided for licensing and distribution agreements, made payments to the generic companies, and required one generic maker to change its Paragraph IV certification to a Paragraph III certification. Bayer and Barr, one of the settling generic manufacturers, submitted a two-page consent judgment to the court, which the judge signed. That agreement provided that Barr had infringed Bayer's patent but did not

mention Bayer's payment to Barr or the agreements Bayer made with the other

generic competitors.

> Defendants' argument [that the consent judgment is protected by Noerr-Pennington] is easily refuted. The challenged agreements in this case are private agreements between the defendants, in which Judge Knapp played no role other than signing the Consent Judgment. The Consent Judgment did not include the terms of the agreements, nor was the judge even apprised of the terms before he "so ordered" the Consent Judgment. Even if signing the Consent Judgment could be construed as approving the Settlement Agreements, government action that "amounts to little more than approval of a private proposal" is not protected. Cantor v. Detroit Edison Co., 428 U.S. 579, 602 (1976).

In re Cipro, 261 F. Supp. 2d at 212-13. The settlement agreement, like the judgment

in Nexium, was not immune from antitrust scrutiny.

Conversely, in MedImmune, Inc. v. Genentech, Inc., No. CV 03-2567 MRP,

2003 WL 25550611 (C.D. Cal. Dec. 23, 2003), the court concluded that a consent

judgment was protected by Noerr-Pennington immunity. In that case, the parties

reached an agreement, and then they worked with Judge Chesney of the Northern

District of California to develop an order and judgment which Judge Chesney signed.

Like the plaintiffs in Nexium and Cipro, MedImmune argued that the results of the

consent judgment could have been obtained without the court's approval. But the

court noted that "[n]o law supports MedImmune's contention that *Noerr-Pennington*

immunity does not attach to petitioning if the petitioner's desired result could have

been accomplished through means not involving petitioning." Id. at *6. Even

accepting MedImmune's arguments,

> This case can be distinguished from those that do not raise *Noerr-Pennington* questions because this is not a case of the government acting in some way on an agreement that is independently anti-competitive, but the very anti-competitiveness of the agreement depends on the government exercising its discretion to create an anti-competitive result. … This is not a case of an anti-competitive private agreement receiving immunity because it passed through government hands in some ministerial way. Here, the very anti-competitiveness of the agreement depended on the government exercising its independent power to decide priority and issue the [new patent at issue]… the Defendants in this case did not merely present their settlement to Judge Chesney for approval; they sought a Judgment and an Order as well. The documents that [Judge Chesney] signed accomplished results, such as overturning [the PTO's Board of Patent Appeals and Interferences] priority decision, that could not have been accomplished through private agreement.

Id. at *6-7. Because of Judge Chesney's role in developing the consent judgment, and

because the judgment itself did more than make a settlement arrangement between

parties the judgment of the court, the court concluded that the consent judgment was

protected by Noerr-Pennington.[7]

### B.    **Noerr-Pennington Immunity Should Not Apply Here**

The reverse payment agreement between ParPaddock and Solvay should not be

entitled to Noerr-Pennington immunity. First, the consent judgment here, which did

---

[7] The Federal Circuit affirmed the district court on other grounds and did not reach the issue of Noerr-Pennington immunity. MedImmune, Inc. v. Genentech, Inc., 427 F.3d 958, 967 (Fed. Cir. 2005), rev'd on other grounds, 539 U.S. 118 (2007).

not encompass the full scope of ParPaddock and Solvay's agreement, was more like the consent judgments in <u>Nexium</u> and <u>Cipro</u> than the one in <u>MedImmune</u>. Second, the Supreme Court's <u>Noerr</u>-<u>Pennnington</u> precedents, read in conjunction with <u>Actavis</u>, counsel against immunizing this reverse payment agreement. Third, consent judgments of this nature should generally not be entitled to <u>Noerr</u>-<u>Pennington</u> immunity.

As noted, the consent judgment between ParPaddock and Solvay did not encompass their entire agreement. The consent judgment provided the following:

1.    This Court has jurisdiction over the parties and subject matter of this action.

2.    The '894 Patent is owned by Plaintiffs [Solvay] (or its affiliates) and is valid and enforceable, as asserted in their Complaint against Paddock, in all respects.

3.    Paddock and Par acknowledge that the claims of the '894 Patent are valid and enforceable in all respects.

4.    Paddock and Par acknowledge that the sale of the product described in its Abbreviated New Drug Application No. 76-744 (the "Paddock Product") would infringe the claims of the '894 Patent, as asserted in the Complaint against Paddock.

5.    Paddock assigned its rights in the Paddock Product to Par and Par has assumed certain obligations to defend Paddock in the Litigation.

6.    As a result, Paddock and Par are barred from practicing the '894 Patent until the earliest of (a) August 31, 2015, provided there is no commercialization sufficient to trigger Hatch-Waxman 180 day exclusivity; (b) the date any Generic Testosterone Gel Product (as defined in the relevant Agreements) is offered for sale in the Territory (as defined in the relevant Agreements); or (c) in any other event, February 28, 2016, by manufacturing, marketing or selling the Paddock Product, pursuant to the terms of the parties' Agreements that permit the practice of the '894 Patent.

7.      The submission of Paddock's Abbreviated New Drug Application No. 76-744 under Section 505(j) of the Federal Food, Drug and Cosmetic Act is an act of infringement of the '894 Patent under 35 U.S.C. 27 1(e)(2)(A).

8.      Paddock and Par would infringe the '894 Patent by selling, offering to sell, importing and/or using the Paddock Product.

9.      All affirmative defenses, claims and counterclaims, which have been or could have been raised by Paddock in this action with respect to the validity or enforceability of the '894 Patent, are dismissed with prejudice.

10.     Except as agreed to by the parties pursuant to the Agreements in settlement of this Litigation or otherwise, Paddock and Par are also hereby enjoined and estopped during the term of the '894 Patent, from making any challenge to the validity or enforceability of the '894 Patent with respect to the claims asserted against Paddock, or from marketing and selling the Paddock Product.

11.     The foregoing injunction against Paddock and Par shall take effect immediately upon entry of this Judgment, and shall continue generally with respect to the '894 Patent coterminous with the license grant provided by the Agreements, unless earlier terminated or modified by further order of this Court.

12.     The parties waive all right to appeal from this Judgment.

13.     This Court shall retain jurisdiction of this action and over the parties for purposes of enforcement of the provisions of this Judgment.

14.     Each party is to bear its own costs and attorney's fees.

(Defs.' Mot. to Dismiss Ex. A). This consent judgment merely embodied some of the private agreements between ParPaddock and Solvay. Notably, the profit sharing agreements were not included.  ParPaddock and Solvay entered into a series of agreements – a settlement agreement, a co-promotion agreement, and a back-up manufacturing agreement – along with the consent judgment that together form the basis for the FTC's lawsuit. (See Sec. Am. Compl. at ¶¶ 69-80). In Cipro, the fact that

the consent judgment itself did not include all the terms of the agreement counseled against extending Noerr-Pennington immunity to the agreement. See In re Cipro, 261 F. Supp. 2d at 212-13. Indeed, the second amended complaint explicitly alleges that ParPaddock's reverse payment agreement with Solvay was not contingent on the issuance of the consent judgment. (Sec. Am. Compl. ¶ 80). Further, according to the complaint, the Court, like the court in Cipro never saw or approved the agreements setting forth Par's compensation for agreeing to stay off the market. (Id. at ¶ 80). Likewise, unlike the consent judgment in MedImmune, this consent judgment did not require the Court to exercise its independent power to achieve the desired results. At most, this consent judgment "serves merely to memorialize a bargained-for agreement." In re Nexium (Esomeprazole) Antitrust Litigation, No. 12-md-02409-WGY, 2013 WL 4832176, at *19 (D. Mass Sep. 11, 2013). If ParPaddock and Solvay could obtain antitrust immunity merely by securing a consent judgment, they would have "an avenue wholly impervious to antitrust scrutiny simply by seeking out a court's rubber-stamped approval." Id.; In re Cipro, 261 F. Supp. 2d at 213 ("government action that 'amounts to little more than approval of a private proposal' is not protected").

Additionally, the holding in Actavis indicates that Noerr-Pennington should not protect the reverse payment settlement. As noted, "[t]he scope of Noerr-Pennington]

protection depends … on the source, context, and nature of the anticompetitive restraint at issue." Allied Tube, 486 U.S. at 499. In Allied Tube, the Supreme Court concluded that efforts to influence a private standard setting organization did not warrant Noerr protection. The Court noted that "[w]hat distinguishes [Allied Tube] from Noerr and its progeny is that the context and nature of petitioner's activity make it the type of commercial activity that *has traditionally had its validity determined by the antitrust laws themselves*." Allied Tube, 486 U.S. at 505 (emphasis added). In Actavis, the Court specifically stated "that the FTC must prove its case as in other rule-of-reason cases." Actavis, 133 S. Ct. at 2237. The anticompetitive nature of the Defendants' settlement must be based on the reverse payment's "size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." Id. Based on this language, the settlement arrangement between ParPaddock and Solvay is *precisely* the type of agreement that should have its validity determined by the antitrust laws themselves. Thus, according to Allied Tube, the consent judgment should not have Noerr-Pennington immunity. Indeed, providing the consent judgment with Noerr-Pennington immunity would largely eviscerate the ruling in Actavis and the Court can be sure that subsequent patent settlements would always include a consent judgment.

Finally, the nature of consent judgments themselves counsels against extending Noerr-Pennington protection. Although consent judgments can be labeled as a judgment or as a private contract, the "voluntary nature of a consent decree is its most fundamental characteristic." Local No. 93, Intern. Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 521-22 (1986).

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus, the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

Id. at 522 (quoting United States v. Armour & Co., 402 U.S. 673, 681-82 (1971)). Here, the consent decree was formed by Par and Solvay to settle their dispute, not by the Court in order to terminate pending litigation. (Sec. Am. Compl. ¶ 80). "Indeed, it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." Id. (quoting United States v. Ward Baking Co., 376 U.S. 327 (1964)). This logic indicates that the "source ... of the anticompetitive restraint at issue" is the parties' reverse payment agreement itself, not the governmental action.

See Allied Tube, 486 U.S. at 499. The Defendants' private agreement should not be due Noerr-Pennington immunity.

Further, the consent judgment here, unlike a final judgment on the merits, could not have preclusive effect on non-parties. "[A] consent judgment, even one entered at the behest of the [Department of Justice], does not immunize the defendant from liability for actions, including those contemplated by the decree, that violate the rights of non-parties." Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 13 (1979). Although the consent judgment purports to control generic entry before 2015 and hold the AndroGel patent valid, the consent judgment does not prevent a new party from challenging the '894 Patent. See, e.g., Local 93, 478 U.S. at 529 ("parties who choose to resolve litigation through settlement may not dispose of the claims of a third party"); Foster v. Hallco Mfg. Co., Inc., 947 F.2d 469, 480 (Fed. Cir. 1991) ("Where a judgment between parties is entered by consent prior to trial on any issue, no issue may be said to have been fully, fairly, or actually litigated."); Kaspar Wire Works, Inc. v. Leco Engineering & Mach., Inc., 575 F.2d 530, 537 (5th Cir. 1978) ("Because the judgment entered in [Defendants' prior] action was a consent decree dismissing the suit, we need not consider to what extent the resolution of a particular issue need be embodied in a declaration of rights for a reviewing court to consider the issue adjudicated for issue preclusion purposes … no

issue of law or fact was ever adjudicated [and] we thus hold that the judgment in [Defendants' prior] suit has no preclusive effect [with respect to the plaintiff's] claim for infringement."). <u>Cf</u>. <u>Antrim Min., Inc. v. Davis</u>, 775 F. Supp. 165, 171 (1991) ("Private parties in [Pennsylvania clean water law] litigation may enter consent decrees which do not require the abatement of pollution. For example, in this case, the parties' mutual reluctance to endure the costs and uncertainty of litigation led to the entry of a consent decree… Allowing such litigation to bar subsequent enforcement efforts by [state enforcement agencies] could conceivably grant a polluter a license to continue to pollute and would limit [the agencies'] discretion to enforce the law in the public interest."). Because the resolution of this case through a consent judgment does not provide for issue preclusion in subsequent litigation with non-parties, the consent judgment is not the sort of government action typically due <u>Noerr</u>-<u>Pennington</u> immunity.

 In sum, the consent judgment here is not entitled to <u>Noerr</u>-<u>Pennington</u> immunity. The judgment did not contain the full scope of the agreement between ParPaddock and Solvay. Further, the full agreement between ParPaddock and Solvay is precisely the sort of agreement the Supreme Court directed district courts to review with the rule of reason. Allowing the Defendants to shield themselves from antitrust

scrutiny simply by obtaining a consent judgment would largely eliminate the application of the Supreme Court's decision in <u>Actavis</u>.

## IV.  Conclusion

For the reasons set forth above, Defendants Par and Paddock's Motion to Dismiss the Second Amended Complaint [Doc. 923] is DENIED.

SO ORDERED, this 18 day of April, 2014.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge